KELLY CARTER,

        *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

CASE NO. 16-13204

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 20, 24)

### A.      Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Kelly Carter's claim for disability benefits under the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*, and Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 1; Tr. 1-3). The case is before the undersigned magistrate judge pursuant to the parties' consent under 28 U.S.C. § 636(c), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference. (Docs. 4, 10, 12). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 20, 24).

Carter was thirty-six years old as of July 20, 2015, the date of the ALJ's decision. (Tr. 20, 170). Her applications for benefits were initially denied on May 6, 2014. (Tr. 94-95). Carter requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Patrick J. MacLean on May 15, 2015. (Tr. 25-65). Carter, represented

by attorney Samantha Ball, testified, as did vocational expert ("VE") Pauline McEachin. (*Id.*). On July 20, 2015, the ALJ issued a written decision in which he found Carter not disabled. (Tr. 9-20). On July 5, 2016, the Appeals Council denied review. (Tr. 1-4). Carter filed for judicial review of that final decision on September 6, 2016. (Doc. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286

(6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment

meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Carter not disabled under the Act. (Tr. 20). The ALJ found at Step One that Carter had not engaged in substantial gainful activity following the alleged onset date, May 1, 2013. (Tr. 11). At Step Two, the ALJ concluded that Carter had the following severe impairments: "status/post excision of melanomas from back; degenerative changes of the lumbar spine; facet arthritis T10-T11; myelopathy of lumbar spine; fibromyalgia; obesity; and depression." (Tr. 11-12). At Step Three, the ALJ found that Carter's combination of impairments did not meet or equal one of the listed impairments. (Tr. 12-13). The ALJ then found that Carter had the residual functional capacity ("RFC") to perform sedentary work, with additional limitations as follows:

> [C]an never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. The claimant must avoid concentrated exposure to moving machinery and unprotected heights. The claimant can perform work that is limited to simple routine and repetitive tasks.

(Tr. 13-19). At Step Four, the ALJ found that Carter was unable to return to her past relevant work. (Tr. 19). At Step Five, the ALJ found that Carter could still perform jobs which exist in significant numbers in the national economy, and was thus not disabled. (Tr. 19-20).

E.     **Administrative Record**

1.     **Medical Evidence**

The Court has thoroughly reviewed Carter's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

2.     **Application Reports and Administrative Hearing**

a.     **Carter's Function Report**

Carter completed a function report on March 20, 2014. (Tr. 249-56). She wrote that she was in pain "every day," had stiff joints, numbness in her extremities, increased pain with activity, and pain-induced migraines. (Tr. 249). Following a "full day of activity," she found herself bedridden for two to three days, and required "help to get around." (*Id*.). She rose each morning around five to assist her sons in getting to school. (Tr. 250). When possible, she would prepare dinner and clean up the house, but "lately [she was] in bed alot [sic] due to fatigue." (*Id*.). She assisted her sons to complete their homework. (*Id*.). She ensured that her sons were properly clothed and had something to eat. (*Id*.). Carter owned a dog, but her care for the pet was limited to letting the dog outside. (*Id*.). She sometimes relied on a close friend for assistance when she was unable to walk. (*Id*.).

Carter's sleep was interrupted by crying due to pain which radiated from her hips down through her feet. (Tr. 250). In terms of personal care, Carter wrote that she has difficulty bending to put on clothing, getting in and out of the shower, did not style her hair due to difficulty holding a hair drier, had trouble stooping to shave, required help cooking on occasion, had trouble getting of the toilet, had trouble going down stairs, and had difficulty carrying laundry. (*Id.*).

When suffering from migraines, Carter relied on her friend to provide migraine medicine; her migraines were so severe that she was reluctant to move. (Tr. 251). She cooked two or three days every week. (*Id.*). She washed laundry and dishes, but did "a little bit at a time;" she did not perform any outdoor chores. (*Id.*). She had trouble vacuuming and cleaning floors. (*Id.*). Performing indoor chores like laundry and washing dishes took "all day." (*Id.*). She had trouble finishing tasks, and could not "carry anything over 10 lbs." (*Id.*). Following two hours of cleaning house, Carter would be bedridden for two to three days. (Tr. 252).

Carter went outside only rarely because "it is cold," thus her excursions were limited to visiting doctors and shopping in stores. (Tr. 252). Carter asserted that she was "told by two doctors not to drive," because of numbness in her feet. (*Id.*). She shopped in stores weekly for food or other necessities; these trips took "all day." (*Id.*). She had no difficulty handling money. (*Id.*).

Carter asserted that her hobbies included eating lunch with a friend once every few months, and watching television when not suffering from a headache. (Tr. 253). She also complained that she could not sit still for more than thirty-five minutes. (*Id*.). She found it difficult to enjoy herself "much anymore." (*Id*.). She spent time with her children and her friend once or twice weekly, talking or watching movies. (Tr. 253). Once per week she rode a motorized scooter to "just look around," apparently outdoors. (*Id*.). Carter's relationship with her mother was strained due to her failure to pay back borrowed funds. (Tr. 254).

Carter checked boxes indicating that she had difficulty performing all exertional and postural activities, and also had difficulty completing tasks, remembering things, concentrating, understanding, and getting along with others. (Tr. 254). She wrote that she could not lift more than ten pounds, and "even that is too much at times." (*Id*.). She was unable to squat; this prevented her from picking up dropped objects or using a public restroom. (*Id*.). She was unable to "stand long" because of foot numbness; she also experienced back pain and dizziness. (*Id*.). Carter could walk "not long," had trouble sitting for long periods because of tailbone numbness, and was unable to rise from a kneeling position. (*Id*.). She also found it difficult to climb stairs. (*Id*.). She could walk one block at a slow pace, and could continue walking after a ten minute rest. (*Id*.). She could pay attention for thirty minutes. (*Id*.).

When attempting to follow written instructions, she had to "read it over and over." (Tr. 254). As to spoken instructions, she often required repetition "depending on what it is." (*Id.*). Carter got along with authority figures without issue, handled stress and changes in routine "OK," but got "nervous and jump[ed] at little things." (Tr. 255). She walked with a cane when she "feels really ran [sic] down and [her] feet are numb and joints hurt." (*Id.*). She took a variety of medications which caused lightheadedness, nausea, constipation, drowsiness, and vomiting. (Tr. 256). She had difficulty concentrating, felt frustration which impeded her ability to complete tasks, and sometimes cause frustration in others because she was no longer able to live a full life. (*Id.*).

b.      **Third-Party Function Report**

Carter's friend and housemate Morgan Wrobel completed a thirty-party function report on March 20, 2014, which generally confirmed Carter's own report. (Tr. 241-48). More particularly, he wrote that Carter was bedridden "a few days a week" due to extreme pain which prevented her from sitting or standing. (Tr. 241). Even light housework caused pain. (Tr. 242). He helped Carter in taking care of her children, performing housework, and preparing meals. (*Id.*). When she was in too much pain to complete chores around the house, Wrobel or Carter's children would take over. (Tr.

243). Wrobel asserted that when Carter shopped in stores, she made use of an electric scooter. (*Id*.).

### c. Carter's Testimony at the Administrative Hearing

At the May 15, 2015, hearing before the ALJ, Carter testified that her home had between one and two steps at each entrance, and that she had no trouble getting up the single step on the front of the house two or three times daily. (Tr. 31). Her children were ages seventeen and thirteen. (*Id*.). "Throughout the day[]" Carter washed dishes, cooked dinner, performed light dusting, and did some shopping, but did not carry groceries. (Tr. 33).

Carter experienced pain in her back and neck, along with muscle spasms, numbness in her extremities, and burning pain in the neck. (Tr. 33). The pain prevented her from laying or sitting, and her pain was so severe that when she sat she "would scream." (*Id*.). She obtained relief only by leaning over her kitchen table, sometimes for an hour. (*Id*.). She asserted that this pain occurred first on Easter, just a one month prior to the hearing. (Tr. 34). Her pain traveled into her legs, ankles, and shins. (*Id*.). Carter stood, apparently to relieve pain. (Tr. 35). She last worked in May 2013. (*Id*.).

Carter experienced muscle spasm attacks "three or four times since Easter," *i.e.* at a rate of about one per week to one per two weeks. (Tr. 39). Medication helped, but did not resolve, these muscle spasms. (*Id*.).

Carter testified that she took morphine four times daily, which "eases the pain depending on the activity level I had to do for the day." (Tr. 37). She was under consideration for pain relieving lumbar injections at the time of the hearing in the search for greater relief. (Tr. 37-38). She also took the pain medication Dilaudid for "break through pain" two to three times daily. (Tr. 38). She reported that the medication "does help." (*Id.*).

Carter's pain was most intense in her middle back and neck, and she experienced this pain daily. (Tr. 40). The pain was exacerbated by activity, and even the strain of attending the hearing caused Carter to wish to lie down in bed. (Tr. 41). Carter rated her "typical" back and neck pain at an eight out of ten, with ten representing a trip to the emergency room. (*Id.*).

Carter asserted that her medications caused her to experience dizziness and short term memory loss. (Tr. 41). She sometimes napped during the day, but "ma[de] a point not to do that." (*Id.*). She tried to "fight against the depression and not lay down and go to sleep every day." (Tr. 42). Carter stated that following back injections "for two days I have to take it really easy, and the first time I had that done I had no relief from it whatsoever . . . now [Dr. Peppler is] talking about them going in and burning out the nerves to see if I can get any relief from it that way." (*Id.*).

Carter asserted that she slept "pretty well," in part thanks to the prescription medication Xanax. (Tr. 42). Carter could take care of all personal care activities without assistance, but also attested to "really bad day[s] where [she] can't bend." (*Id*.). Carter was able to drive, and did so "once or twice" in a typical week. (Tr. 43). She would sometimes take short trips, including to the store and to drop her child off at school, and on a bi-monthly basis visited Dr. Peppler who practiced one hour from Carter's home. (*Id*.). However, driving this distance caused "more burning in [her] neck and a lot of back pain." (*Id*.). Carter drove herself to the hearing, a distance of eleven miles. (Tr. 44).

As to hobbies, Carter testified that her children enjoyed hunting, but required accompaniment, thus Carter "will sit out there with them . . . for a weekend," which involved about one and one half days of hunting. (Tr. 45). She accompanied her children hunting for about one weekend per year. (*Id*.). When asked whether she climbed into deer stands (*i.e.* elevated perches reached by way of ladder), Carter asserted "I have, yes, and I had taken a fall coming out," and fell "two to three steps to the ground." (Tr. 46). She visited the bank monthly, and sometimes took short walks by the water. (Tr. 46-47). Carter later testified that she did not actually hunt herself, and relied on cousins to accompany her children part of the time." (Tr. 55). She drove her children to Midland, Michigan so that they could hunt on a friend's property. (*Id*.). That trip took about forty-five minutes. (Tr. 58).

Carter testified that she had difficulty sitting for longer than ten minutes at a time, at which point she experienced worsening pain in her thighs and lower back bilaterally. (Tr. 47). She also had trouble standing for long periods of time; by way of example, she found it difficult to stand for more than fifteen minutes when stewing tomatoes. (Tr. 48).

Carter told the ALJ that she did not have difficulty walking. (Tr. 48). She then clarified that she was "in pain all the time again," and asserted that she could "walk like a block, block and a half and then I might have to sit down." (*Id*.). She was at one point walking with the use of a cane because her "legs were actually just giving out." (*Id*.). Her back pain also sometimes caused difficulty walking. (*Id*.). She no longer used a cane at the time of the hearing because her "legs gained the strength back." (Tr. 49).

Carter was most comfortable lying down with her legs propped up on a pillow. (Tr. 50). She could lift roughly one gallon of milk. (*Id*.). She had no difficulty using her hands to manipulate objects. (*Id*.).

Carter asserted that her primary care physician diagnosed depression and anxiety, but had never recommended that Carter seek out care from a mental health specialist for those conditions. (Tr. 50). Carter's memory was "not as good as [it] used to be." (Tr. 51). Carter watched television when she lied down at night, and often fell asleep while watching television. (*Id*.). She owned a computer, but did not make use of it because it caused migraines. (*Id*.). She used a smartphone to access the internet once or twice daily

13

for ten or fifteen minutes, but also found that it could cause migraines. (Tr. 52). Carter got along well with others, and considered herself a "people person." (*Id.*).

Carter stated that her boyfriend's mother was a masseuse who would sometimes give Carter free massages in an attempt to ameliorate her pain. (Tr. 53). Carter also asserted that her goal was to no longer be on pain medication. (*Id.*).

Carter also asserted that she napped during the daytime two or three times per week, for about 120 to 180 minutes per nap. (Tr. 54). She found it necessary to nap when she was in "such physical pain that [her] body [is] just emotionally and physically drained," and was consequently unable to focus. (*Id.*). The ALJ inquired as to the length of Carter's naps given her asserted intention to avoid them. (Tr. 57). Carter stammered that "[i]t's I would say, like, I will, I'm in the bed laying down trying to take the pain off of my back. I may take a nap, like two times a week. I, instead of going asleep, I try to read a book when I'm laying [sic] down or something." (*Id.*).

Carter asserted that when performing "light, light, light housekeeping" tasks she would work for fifteen or twenty minutes, then rest in a laying position. (Tr. 54-55). She described her pain as having "grown so constant[]" and "so intense" that she could "never go back and do what I used to do." (Tr. 56). She described her pain as taking her "breath away," and causing migraines, which "knocked [her] down for a couple days." (*Id.*). She suffered migraines three times monthly, each lasting up to four days, despite the use of

14

anti-migraine medication. (*Id*.). The migraines were so severe that they caused Carter to vomit. (Tr. 57).

### d.     The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Carter's ability to perform work. The ALJ first asked the VE to characterize Carter's past relevant work. (Tr. 58-61). Because the ALJ proceeded to Step Five, Carter's past work is irrelevant to this appeal. (*Id*.).

The ALJ then asked the VE to assume a hypothetical individual who was limited to light work; but who could perform "[n]o climbing ladders, ropes, or scaffolds. Occasionally climb ramps or stairs, balance, stoop, knee, and crawl. Avoid concentrated fumes, and moving machinery, concentrated exposure to unprotected heights . . . . [C]an do work that is simple, routine, and repetitive . . . ." (Tr. 61). The VE asserted that such a worker could perform the jobs of inspector (180,000 jobs nationally), inspector assembler (125,000 jobs), and packager (130,000 jobs). (Tr. 62).

In a second hypothetical, the ALJ asked the VE to imagine the same restrictions as before, but to add that the individual would be limited sedentary work. (Tr. 62). The VE found that such a worker could perform the jobs of order checker (180,000 jobs), and assembler (150,000 jobs). (Tr. 62-63).

Finally, the ALJ asked the VE to assume a worker limited to the sedentary level of exertion, and who further was "unable to stand . . . or walk, two hours out of and [sic] eight hour workday with normal breaks, and . . . and could sit up to six hour per eight hour work day with normal breaks." (Tr. 63). The VE characterized this as accommodated work, and found that no jobs would exist fitting those parameters. (*Id*.). The ALJ then asked whether a worker who was off task for one quarter of the workday could perform competitive work; the VE said no. (*Id*.). The VE further confirmed that employers generally permit no more than one absence per month and eight absences per year. (Tr. 64). Further, employers permit no more than two fifteen minute breaks and a thirty minute lunch per day. (*Id*.).

**F.     Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both     "acceptable"     and     non-

acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating
> source's medical opinion, supported by the evidence in the case
> record, and must be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to the treating
> source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines

whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

Carter argues that the ALJ erred in the following ways: 1) According improperly low weight to the opinion of Carter's treating physician, Dr. Peppler; 2) Failing to account for Carter's moderate limitations to concentration, persistence, or pace ("CPP"). These arguments will be addressed in turn.

21

1.      **The ALJ Sufficiently Justified the Weight Given to Dr. Peppler's Opinions**

i.      **Objective Support for Dr. Peppler's Opinions**

Carter first argues that the ALJ erred by providing inadequate reasons for discounting the opinion rendered by her treating physician, Dr. Peppler, as required by 20 C.F.R. § 404.1527(c)(2). (Doc. 20 at 16-21). ALJs are obligated to consider all of the factors listed in 20 C.F.R. § 404.1527(c) when evaluating medical opinions, but they are not obliged to reference every factor in the decision. *See Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011). Finding a physician's opinion inconsistent with other medical records is sufficient reason to discount even a treating physician's opinion. *See Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Hudson v. Colvin*, No. 15-163-ART, 2015 WL 12684338, at *2 (E.D. Ky. Dec. 23, 2015).

Dr. Peppler drafted an opinion on March 3, 2014, wherein he concluded that Carter suffered from radiating pain due to spinal maladies. (Tr. 413). He checked boxes indicating that Carter would be "off task" more than twenty-five percent of the time, that she was incapable of even a low stress job due to pain, that she could walk less than half a block, could sit for ten minutes at a time, and stand for thirty minutes at a time. (Tr. 415). She could sit and stand/walk for less than two hours per workday each. (*Id*.). She

required a job that permitted her to shift position at will, she required unscheduled breaks hourly lasting up to an hour each, and she required use of a cane or other assistive device to walk. (*Id*.). She could lift less than ten pounds occasionally, ten pounds rarely, and never over ten pounds. (*Id*.). He indicated that Carter would not need to walk around during the workday. (*Id*.). He also indicated that Carter would not need to elevate her legs. (*Id*.). She could look down, turn her head, and hold her head static only occasionally, and could look up only rarely. (*Id*.). She could occasionally twist, but never stoop, crouch, climb ladders, or climb stairs. (Tr. 416). She could use her hands and fingers to manipulate objects only ten percent of the time bilaterally, and could reach only five percent of the time. (*Id*.). She would miss more than four days of work per month. (*Id*.).

On March 17, 2015, Dr. Peppler drafted a second opinion, wherein he concluded that Carter's pain was constant, and got "worse as the day goes on and with activity." (Tr. 524). He noted that her pain was located in the back, legs, arm, and neck, and that the pain was so severe Carter became lightheaded. (*Id*.). She suffered from drowsiness and "sometimes nausea." (*Id*.). Depression, anxiety, and fibromyalgia contributed to the severity of Carter's symptoms. (Tr. 525). Again, he concluded that Carter would be off task twenty-five percent of the time, could not perform even a low stress job, and noted that "any amount of stress triggers fibro and being in pain everyday is cause of

23

depression." (*Id*.). He found that Carter could walk only half a block, could sit for five to ten minutes a time, but curiously also appeared to indicate that Carter could sit for "1/2" of an hour at a time. (*Id*.). Likewise, he found that Carter could stand for five to ten minutes at a time, but again wrote "or 1/2 hr." (*Id*.). The meaning of these notations is obscure. Dr. Peppler wrote that Carter could sit or stand/walk for less than two hours in each workday. (Tr. 526). In contradiction to his earlier opinion, Dr. Peppler concluded that Carter would need periods of walking around during the workday, and wrote that she should walk around every five to ten minutes for four or five minutes per break. (*Id*.). Carter would need to shift positions at will, would need unscheduled breaks "very frequently," and would need to rest for ten to fifteen minutes per session. (*Id*.). Again, in contradiction to his earlier opinion, Dr. Peppler wrote that Carter would need to elevate her legs at "above heart" height for four to eight hours per workday. (*Id*.). She would only "sometimes" use a cane or other assistive walking device. (*Id*.). She could rarely lift more than ten pounds, and could never lift more than that weight. (*Id*.). She could only occasionally look down or turn her head, could rarely look up, and could never hold her head static. (Tr. 527). Again, in contradiction to his earlier opinion, Dr. Peppler wrote that Carter could "rarely" stoop, crouch, climb ladders, or climb stairs. (*Id*.). He wrote that Carter could use her hands and fingers ten percent of the time, and could reach five

percent of the time. (*Id.*). She was likely to have good and bad days. (*Id.*). He also found that Carter would miss more than four days per month. (*Id.*).

The ALJ rejected Dr. Peppler's opinions entirely, finding that they were "based on subjective complaints from the claimant and are not supported by the record." (Tr. 18). Carter attempts to bolster the reliability of Dr. Peppler's opinions by noting that he has "been fully involved in the longitudinal picture of the Plaintiff's care," having treated her on a monthly or bi-monthly basis for several years. (Doc. 20 at 19). While this is true, a doctor's opinion must be weighed not only by the doctor's familiarity with the patient, but also by the consistency with the other evidence of record.

Carter also notes that throughout the treatment record she complained of "back pain rated at 7 – 10" (*Id.*), but this does nothing to refute the ALJ's conclusion that Dr. Peppler's assessment is based on Carter's subjective complaints.

Carter further asserts that on physical exam she consistently had "marked or significant tenderness in the neck and back along with positive straight leg raise tests." (*Id.* at 20). That Carter expressed complaints of tenderness again does nothing to refute the ALJ's conclusion that Dr. Peppler's assessment was based on subjective complaints alone, and indeed tends to confirm that conclusion. Evidence of positive straight leg tests provide some objective evidence favoring Dr. Peppler's findings, but do not provide objective support for the full extent of wide ranging and extreme degree of limitation he

suggests. *See McKay v. Astrue*, No. C07-5334BHS-KLS, 2008 WL 2074053, at *4 (W.D. Wash. May 14, 2008) ("Positive straight leg and decreased sensation findings, furthermore, do not by themselves constitute significantly probative evidence of disability, let alone work-related limitations."); *see also Bruce v. Comm'r of Soc. Sec.*, No. 10-10426, 2011 WL 833792, at *3 (E.D. Mich. Mar. 4, 2011) ("A mere diagnosis does not establish a severe impairment or the existence of a functional limitation.").

Carter also references a 2013 MRI which suggested moderate facet arthritis and facet arthropathy causing effacement of the thecal sac. (Doc. 20 at 20; Tr. 464). Yet a March 2014 MRI showed only "mild to minimal facet degenerative changes in lower lumbar spine, no significant focal area degenerative change to account for patient's symptoms," suggesting that the 2013 MRI may have overstated the degree of degeneration. (Tr. 476). Other physicians noted that radiological evidence did not support Carter's degree of asserted limitation. In August 2013 Carter visited the emergency room for allegedly worsening back pain; x-rays were noted to "show no acute process," her strength was normal, and a physical exam produced nominal results. (Tr. 353). Carter alleged pain so severe that even use of Percocet and morphine did not provide sufficient relief, yet she "was noted to be up and walking around the department to go to the bathroom," suggesting that she may have been exaggerating her degree of pain. (*Id.*).

I further note that Carter makes little reference to Dr. Peppler's treatment notes, likely because those notes do not support her asserted degree of disability. A physician's opinion which does not contain sufficient justifications for the diagnoses rendered may nevertheless be due weight where the physician's treatment notes and other findings provide sufficient support for the limitations provided in the opinion. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (finding that a physician's opinion was not patently deficient where the claimant's "numerous x-rays, CT scans, and MRIs present objective findings that are, at the very least, not inconsistent with his treating physicians' opinions").

In September 2013 Dr. Peppler noted that Carter walked with a "somewhat stiff upright gait." (Tr. 393). In October 2013 Dr. Peppler noted that, despite the benefit of an MRI, he could "not tell her exactly why she is having the pain right now." (Tr. 399). In February 2014 Carter treated with a different medical professional at Dr. Peppler's office, who suggested that Carter might suffer from hyperalgesia, *i.e.* hyper-sensitivity to pain, again suggesting that her objectively supportable limitations did not explain her alleged degree of pain. (Tr. 405). In March 2014 a physician reviewing an MRI noted that there was "no significant focal area [of] degenerative change to account for patient's symptoms" (Tr. 476), once again suggesting Carter's alleged symptoms were not supportable. In April 2014 her pain was better despite a very busy week. (Tr. 409). In

June 2014 Carter had a relatively normal gait. (Tr. 512). In October 2014 she fell from a tree stand; Dr. Peppler noted that Carter "over did it by going hiking and pulling equipment with her boys." (Tr. 506). He further noted that Carter was "able to drive, do house chores, and regular activities." (*Id*.). In December 2014 he noted that Carter had been riding "a 4 wheeler going up a hill," whereupon Carter fell off and hurt her neck. (Tr. 503). Carter maintained this level of activity despite what she described as pain ranging between "4/10" with medication and "8/10" with medication. (Tr. 506). Following her all-terrain vehicle accident she complained of "10/10" pain without medication, and "7/10" pain with medication, despite the use of the powerful pain reliever Dilaudid four to six times daily. (Tr. 503). Also in December 2014 Carter walked with a "relatively normal upright gait." (Tr. 504). In February 2015 Dr. Peppler noted, without qualification, that Carter cleaned her closet, took care of her children, completed chores, and shopped for groceries; she had a good range of motion and a normal gait. (Tr. 501).

I also note that Dr. Peppler's opinions are unpersuasive in part because they are self-contradictory. In 2014 Dr. Peppler found that Carter would not need to walk around during the workday, yet in 2015 he found that Carter would require such an accommodation. (Tr. 415, 526). This restriction finds no support in the record. Indeed, Carter testified that walking was quite difficult for her, and that she could walk only one

block without rest (Tr. 254). Dr. Peppler appears to have created this proposed limitation out of whole cloth, which seriously degrades the supportability of his opinion as a whole and brings his partiality into question.

Likewise, in 2014 Dr. Peppler found that Carter would not need to elevate her legs, yet in 2015 he proposed the extreme restriction that Carter would need to elevate her legs above heart height for half to all of the workday. (Tr. 415, 526). Carter mentioned that she was most comfortable lying down with her legs propped up on a pillow (Tr. 50), never asserted that she elevated her legs for four to eight hours daily. Elevating ones legs, particularly above heart height, would render Carter bedridden during a major portion of each day, and Carter's failure to even hint at such a restriction again suggests that Dr. Peppler significantly exaggerated this limitation.

Dr. Peppler wrote in both of his opinions that Carter would be able to use her hands for only ten percent of the workday (Tr. 416, 527), an extreme degree of restriction that would preclude all work, and indeed preclude the performance of most any activity requiring manipulation of objects. While Carter ticked a box in her function report indicating her ailments affected her ability to use her hands, she wrote in a section reserved for remarks that her "hands seem like they are holding fluid." (Tr. 254, 256). Carter testified at the oral hearing that she had no difficulty whatsoever using her hands to manipulate objects. (Tr. 50). Nothing in the record supports a finding that Carter would

be unable to use her hands for any portion of a workday, much less ninety percent of the workday. Furthermore, Carter attested to performing numerous tasks which involve the use of her hands, including cleaning, cooking, shopping, and climbing ladders. Dr. Peppler appears to have summoned this restriction from the ether, apparently in an attempt to make Carter appear as disabled as possible. In so doing, he revealed his unreliability as a source of medical information, and thereby justified the ALJ's treatment of his opinions.

Dr. Peppler also found in 2014 that Carter could hold her head in a static position "occasionally," but in 2015 concluded that Carter could "never" hold her head static. (Tr. 415, 527). While Carter complained of neck pain, she never suggested that she was unable to hold her head in a static position. She attested to being able to perform activities like watching television, driving, sitting with her children while hunting, and cooking without interference from the need to constantly move her head.

Dr. Peppler found in 2014 that Carter did not require use of any walking aids, yet in 2015 he concluded that she required the use of a cane. (Tr. 415, 527). This is particularly unusual because in 2014 Carter wrote in her function report that she required the use of a cane (Tr. 255), whereas in her 2015 testimony at the hearing before the ALJ she admitted that she no longer required the use of a cane (Tr. 49).

In sum, Dr. Peppler crafted opinions which are generally unsupported by other evidence in the record, are self-contradictory, and are so extreme as to exceed all reason. It is one thing for a physician to paint a negative picture of their patient's health in an attempt to assist the patient in obtaining benefits, but it is another thing entirely for the physician to simply invent limitations which have no basis in the record. This is a textbook example of a "good reason" for reason for giving no weight to a physician's opinion.

ii.     Consistency Between Carter's Alleged Degree of Disability and Activities of Daily Living

Carter notes that the ALJ justified the weight to Dr. Peppler's opinion in part based on her ability to cook, grocery shop, and perform light housework.[1] (Doc. 20 at 18). Carter complains that she attested to performing these activities only in spurts, with breaks to lie down after every fifteen or twenty minutes of work. (*Id.*). Carter's testimony generally supports her assertion that she performs housework in short bursts, with breaks in between. (Tr. 48, 54-55, 252). Review of the ALJ's decision confirms that the ALJ did not make mention of the intermittent nature of Carter's chores. (Tr. 17). The ALJ merely noted that Carter could "do the laundry, wash dishes and go out grocery shopping once a week . . . cook dinner, perform light dusting and shopping. She also testified [that she]

---

[1] While Carter alleges that she suffers from both physical and mental limitations, she alleges only that her depression and anxiety would limit her ability to concentrate, and does not suggest that her ability to visit stores or perform chores is impeded by her mental functioning. (Doc. 20 at 12, 23).

accompanied her sons when they went hunting and she goes to the bank once a month." (Tr. 17).

Carter's complaints are not without merit. Even assuming that Carter was unimpeded in her ability to visit the bank once a month, wash dishes, and perform light dusting, these activities do not automatically equate with non-disability. In addition, Carter testified that she performs these activities intermittently. *See Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("[T]he fact that Plaintiff engages in minor life activities is not inconsistent with a disabling level of pain."); *Allan v. Comm'r of Soc. Sec.*, No. 10-CV-11651, 2011 WL 2670021, at *3 (E.D. Mich. July 8, 2011) (holding that "Plaintiff's ability to perform . . . limited, brief activities" including preparing meals, performing light household chores, watching television and maintaining social interaction, "all of which involve no prolonged movement and little to no exertion of energy—simply does not undercut the truthfulness of Plaintiff's allegations of pain"); *see also Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) ("'Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.'") (quoting Smith v. Califano, 637 F.2d 968, 971 (3rd Cir. 1981)).

The ALJ could (and perhaps should) have spent more effort specifically comparing Carter's testimony, alleged limitations, and activities of daily living. Nevertheless, I find that the ALJ's credibility determination is supported by substantial

evidence. Review of the record clearly supports the ALJ's finding that Carter's testimony is internally inconsistent and less than credible. As detailed above, Carter asserts that she suffers from extreme pain in her back, neck, and legs, along with paresthesia of the extremities. (Tr. 33-35, 38). This pain was allegedly so severe that even the frequent use of powerful medications like morphine, Dilaudid, Percocet did not provide complete relief. (Tr. 38-40). At the 2015 oral hearing, she complained of difficulty standing for more than ten minutes at a time due to back pain. (Tr. 47). Carter attested that a "full day of activity" would render her bedridden for several days (Tr. 249), yet she asserted that shopping in stores weekly for food took "all day" (Tr. 252). Moreover, shopping in stores "all day" was not the only cause of Carter becoming bedridden. She also alleged that after cleaning her house for only two hours, she would be bedridden for two to three days. (Tr. 252). Because Carter attested to shopping in stores for food weekly, her house cleaning would necessarily overlap in some weeks with her shopping trips. During those weeks, she would apparently be totally bedridden for between four and six days. Carter also alleged that she was bedridden by migraines three times monthly, for up to four days per instance. (Tr. 56-57). Carter alleged that she was also disabled by muscle spasms, which occurred three to four times in the month prior to the oral hearing. (Tr. 33). This would mean that Carter was totally bedridden on a near-constant basis.

This degree of limitation would have a tremendous impact on Carter's ability to function, yet she did not describe this extreme degree of restriction in her testimony, nor did she complain of such restriction in the medical records. On the contrary, she described being able to care for her children, cook, clean, drive, take walks, and perform other time consuming activities. Carter's testimony is plainly inconsistent with itself and with the other evidence of record.

In her 2014 function report, Carter checked boxes indicating that she did not drive because she was "told by two doctors not to drive" (Tr. 252), yet at the 2015 hearing before the ALJ Carter admitted to driving an hour to the doctor's office, to the oral hearing, to her children's school, and to her hunting spot in Midland (forty-five minutes away) (Tr. 43-44, 55). This is also inconsistent with Carter's assertion in her function report that she could sit for only thirty-five minutes (Tr. 253), and at the hearing that she could sit only for about ten minutes (Tr. 47).

It is also notable that Carter said she went outside infrequently not because of difficulty walking or sitting, but because "it is cold." (Tr. 252). Given that Carter alleges her ability to walk is limited primarily by back pain, one would expect that she would cite this allegedly disabling condition as the cause for her inability to travel outside of the home.

Carter also asserted at the hearing that she had no trouble walking; she changed her testimony seconds later, asserting that she could walk only a block and a half because her "legs were actually just giving out" and due to severe back pain. (Tr. 48). Where Carter alleges that her back pain constantly registers at an eight out of ten, and where Carter alleged that the strain of the hearing was so severe that it made her pine for her bed, it is surprising that she would forget this source of allegedly disabling pain even briefly. (Tr. 41, 55). While this may have simply been a misstatement, I note it in given the overall inconsistency of Carter's testimony.

Carter's testimony regarding sleep is also marred by inconsistency. In her 2014 function report, Carter asserted that her sleep was interrupted by crying due to pain. (Tr. 250). Yet at the 2015 hearing before the ALJ, Carter testified that she slept "pretty well" (Tr. 42), and indeed testified that she napped or slept as a means of obtaining pain relief. (Tr. 54). This is particularly unusual given that Carter asserted her pain had "grown so constant[]" and "so intense" over time, thus one would expect that Carter's sleep would be more interrupted in 2015 than in 2014, yet the inverse appears to be true. (Tr. 54-55).

Carter's testimony regarding naps at the oral hearing likewise appears internally inconsistent. Carter asserted first that she napped two to three times per week for 120 to 180 minutes at a time in order to reduce physical pain. (Tr. 54). Yet Carter testified that she napped primarily due to depression, and that she "ma[de] a point not to do that" in

order to "fight against the depression and not lay down and go to sleep every day." (Tr. 41-42). When the ALJ asked about the frequency and length of Carter's naps at the time of the hearing, she confusingly responded that she naps two times a week, but "instead of going to sleep, I try to read a book when I'm laying [sic] down or something." (Tr. 57). When considered amongst other factors which degrade Carter's credibility, her difficulty answering this straightforward question further suggests that her subjective complaints are not reliable.

In 2014 Carter asserted that she had trouble performing numerous acts of personal care, including getting in and out of the shower, putting on clothing, and getting off of the toilet. (Tr. 250). Yet at the 2015 hearing, she asserted that she could take care of all personal care activities without assistance, and that only on "really bad day[s]" did she have difficulty bending. (Tr. 42). Again, where Carter testified that her pain was progressively worsening (Tr. 54-55), it is unusual that she would express a lesser degree of limitation in 2015 than in 2014, further eroding her credibility.

The ALJ called out an apparent inconsistency between Carter's asserted degree of disability, primarily due to back pain, and her ability to go hunting with her children. (Tr. 17). Carter now complains that the ALJ overstated the extent of this hobby, because she only went "once or twice per year," and did "not actually go hunting," but rather merely accompanied her children. (Doc. 20 at 18).

Carter did not testify to performing some of the more taxing activities involved in hunting, such as dragging or butchering deer. Nevertheless, she admitted to climbing deer stands, sitting (presumably for extended periods) outdoors with her children as they hunted over the course of a weekend, and driving forty-five minutes to the hunting property. (Tr. 45-46, 58). These admissions conflict with Carter's assertion that she could not sit for longer than ten minutes (per her hearing testimony) or thirty-five minutes (per her function report). (Tr. 47, 253). Carter's assertion that she could climb into deer stands, presumably by way of ladder, also tends to undercut her assertions of disabling back pain. Furthermore, Dr. Peppler noted in October 2014 that Carter "over did it by going hiking and pulling equipment with her boys" during a hunting trip. (Tr. 506). In December 2014 she was well enough to ride up hills on an all-terrain vehicle despite complaining of severe back pain. (Tr. 504-06). This level of exertion radically exceeds Carter's alleged degree of limitation, particularly with regard to her alleged inability to walk, lift, carry, pull, sustain physical exertion, and perform other exertional and postural activities. Carter's testimony regarding hunting undercut the credibility of her allegedly disabling limitations, and the ALJ properly relied upon this factor in rendering his credibility finding.

## 2.     The ALJ Adequately Accounted for Carter's CPP Limitations

Carter also argues that the ALJ erred by inadequately accounting for her moderate CPP limitations. (Doc. 20 at 21-24). She notes that the ALJ assessed moderate CPP limitations, but accounted for these in the RFC only by limiting her to "simple routine and repetitive tasks." (*Id*. at 21, 23; Tr. 13). She argues that some decisions have found a limitation to "unskilled work" does not adequately account for moderate CPP limitations because such a restriction does not account for the amount of focus and attention which may be required by unskilled work. (Doc. 20 at 23). By analogy, she suggests that a limitation to "simple routine and repetitive tasks" is likewise insufficient to account for moderate CPP limitations. (*Id*.).

Carter's argument is a variant of an argument frequently raised in this district: that a limitation to "unskilled" or "simple" work does not account for moderate CPP limitations. Courts have resolved this issue both ways. *See Hernandez v. Comm'r of Soc. Sec.*, No. 10–cv–14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). Some judges in this district have noted that even simple, unskilled, routine jobs often require meeting quotas, alertness, or consistent pace. *See, e.g.*, *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005); *see also Teal v. Comm'r of Soc. Sec.*, No. 10-13154, 2011 WL 4484910, at *3 (E.D. Mich. July 12, 2011) (noting that surveillance monitor and visual inspector positions "require a high degree of sustained

concentration"), report and recommendation adopted, No. 10-13154, 2011 WL 4484864 (E.D. Mich. Sept. 26, 2011).

Ultimately, courts must look to "the record as a whole" to determine whether the restrictions included by the ALJ in the RFC assessment are sufficient to account for the claimant's CPP limitations. *Hernandez*, No. 10–cv–14364, 2011 WL 4407225, at *9.

Carter does not point to any medical evidence in the record supporting her claim that a limitation to "simple routine and repetitive tasks" is insufficient to account for her mental health symptoms. Her reliance on Dr. Peppler's opinion that she would be off task for more than one quarter of the day, would regularly miss work, and cannot function even in a low stress job are unavailing because Dr. Peppler's opinions are not supported. Carter is represented by counsel, and must bear the burden of demonstrating her entitlement to disability benefits through Step Four of the sequential evaluation process. She is not entitled to rely upon the Court to scour the medical record on her behalf in the search for evidence which could support her arguments. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004)). Carter's failure to bolster her argument with any references to the record waives that argument.

Even if Carter's argument was not waived, it would fail on the merits. As the ALJ noted, Carter was never referred to a specialist in mental health for treatment of her depression and anxiety, suggesting that these conditions were not particularly severe. (Tr. 50). The ALJ correctly found that "the evidence does not show any significant symptomatology or ongoing diagnosis of depression or anxiety." (Tr. 17). The record contains numerous treatment notes dealing with back pain, lung infections, and other maladies, but scant mention of mental health. Where records do mention mental health, they often indicated normal health, including a 2013 finding that Carter was "[n]egative for depression . . . patient is not nervous/anxious" (Tr. 423, 426), and a 2014 finding that she had "normal mood and affect . . . behavior [was] normal . . . [j]udgment and thought content normal" (Tr. 330). Review of Dr. Peppler's treatment notes reveals some very brief mention of anxiety and depression in 2013, with few references to mental health in the latter portion of her treatment with that physician. (Tr. 387, 388, 390, 394).

Insofar as Carter can be understood to argue that her constant, severe pain would limit her ability to concentrate beyond that accounted for in the RFC, that argument also fails. Carter's objective state of physical health does not support her alleged degree of limitation, and Dr. Peppler's opinion which she alleges supports her subjective complaints is partly composed of fabricated limitations.

**H. Conclusion**

I find that the ALJ's decision, which ultimately became the final decision of the Commissioner, is supported by substantial evidence. The ALJ gave good reasons to discount Dr. Peppler's opinions; those opinions are internally inconsistent, are inconsistent with Dr. Peppler's treatment notes, and inconsistent with Carter's own assertions. The ALJ also adequately accommodated for Carter's moderate CPP limitations, and Carter has failed to identify any evidence suggesting that more stringent limitations are necessary. Given the overwhelming evidence that Carter's complaints are less than credible, and that Dr. Peppler's opinions are not based on evidence, the ALJ's finding of non-disability was the necessary result.

**I. Order**

In light of the above findings, **IT IS ORDERED** that Carter's motion for summary judgment (Doc. 20) is **DENIED**, the Commissioner's motion for summary judgment (Doc. 24) is **GRANTED**, and that this case is affirmed.

Date: June 12, 2017
                                       S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 12, 2017                    By s/Kristen Castaneda
                                       Case Manager